[Civ. No. 19353.   Second Dist., Div. One.   Apr. 12, 1954.]

PIERCE INSURANCE COMPANY (a Corporation), Respondent, v. JOHN R. MALONEY, as Insurance Commissioner, etc., Appellant.

Edmund G. Brown, Attorney General, and Harold B. Haas, Deputy Attorney General, for Appellant.

Sherman, Thompson & McCarthy, Chas. R. Thompson and Arnold M. Cannan for Respondent.

DRAPEAU, J.—Plaintiff was originally incorporated in 1927 under the name of Imperial Mutual Life Insurance Company, as a mutual life and benefit association, pursuant to chapter IV, title 2, part 4, division 1, Civil Code. When the Insurance Code was enacted on September 18, 1935, plaintiff automatically continued business thereunder, in accordance with chapter 8, division 2, part 2 of said code (§§ 10640-10781). During this period it issued "straight assessment" life policies.

On October 28, 1936, pursuant to certain provisions of the Insurance Code, plaintiff transformed itself into an insurer operating under chapter 9 thereof (§§ 10810-10940) as a mutual company. While so operating up to October 28, 1944, it issued policies on the legal reserve, stipulated premium plan and made assessments when the stipulated premiums were insufficient to cover operating and other costs.

In 1939, chapter 9A of the Insurance Code was enacted (§§ 10950-10953.12) which permitted an insurance company operating on a stipulated premium plan under chapter 9 to become a legal reserve, capital stock company.

Accordingly, on October 28, 1944, plaintiff consummated a transformation from a chapter 9 mutual company to a chapter 9A capital stock company, and issued policies on a legal reserve, nonassessable basis.

Thereafter, on December 11, 1946, plaintiff again transformed from chapter 9A to a chapter 6 "old-line, legal reserve, capital stock company," pursuant to sections 10510-10540 of the Insurance Code. And "has at all times since, and now is, an old-line, legal reserve, capital stock company, having the minimum required capital of $200,000.00 and issuing policies on a legal reserve, nonassessable basis." This latter transformation is not material, insofar as the questions here presented are concerned.

In its transformation from chapter 9 to chapter 9A in 1943-1944, plaintiff followed and adopted the procedure set forth in chapter 9A. This called for a vote of two-thirds of the policyholders, and that capital stock be offered to each policyholder pro rata for purchase within 30 days, otherwise to be sold to the public for cash ''and for at least 150% of par value.'' (§§ 10951 and 10951.5, *supra*.)

The effect of the transformation was to put all outstanding business on a nonassessable basis, and to eliminate the additional assessment provisions of chapter 9 policies.

Plaintiff submitted to defendant a certified copy of the transformation proceedings and an application for permit to sell the stock necessary to qualify under chapter 9A.

Because no arrangement had been made therein for compensating the mutual policyholders (as then existing owners) for loss of their equity in the company, defendant raised an objection to issuing the permit.

In this connection, defendant asserted that by enactment of section 10951.2, the legislative intent was that mutual policyholders should have all the rights after transformation that they had before. That the mutual contracts should be carried out in their entirety; that if profits were made from them, they belonged to and should be used or distributed to the mutual policyholders; and in case of deficiencies, they should be made up by assessment.

Because of defendant's insistence upon equitable treatment of the policyholders, the attorney general was requested to render an opinion under section 12923, Insurance Code, as it then read in part: ''. . . The opinion of the Attorney General in response to such submission shall govern and control the commissioner in respect to the matter so submitted. The commissioner shall not be liable, either personally or in his official capacity, for any order, ruling, decision, or act made or done pursuant to such opinion.''

That opinion of the attorney general dated September 13, 1944, contained the following:

''From a review of the entire problem I have come to the conclusion that the Legislature by enactment of Chapter 9A has provided a complete statutory plan for transformation of insurance companies qualifying thereunder. I believe that the plan was meant to set forth the requirements to be met, but that when they have been accomplished, the transformation is complete without granting to the Commissioner discretionary powers to make further or additional requirements

to be complied with. In other words, it is my opinion that the company in question having complied with the provisions of Chapter 9A, is entitled to a permit and the Commissioner shall issue it as his ministerial act.'' (4 Op.A.G. 178, 181.)

Defendant still objected that the elimination in the transformation proceedings of the assessment provisions of the chapter 9 policies was contrary to section 10951.2, *supra,* which provides: ''. . . Such transformation, however, shall in no way annul, modify or change any of the existing contracts and liabilities of such corporation, and any and all such contracts and liabilities shall continue in force and effect the same as though such corporation had not transformed . . . nor shall such transformation in any way prejudice . . . any rights previously acquired.''

The matter was again submitted to the attorney general. In his opinion rendered October 16, 1944 (4 Op.A.G. 285, 286), he points out that the policyholders themselves adopted the provisions of chapter 9A by authorizing amendment of the articles of incorporation without dissent. That to forbid elimination of such assessment features would be inconsistent with the purposes of chapter 9A to promote this kind of transformation. And that the construction sought to be given to the provisions of chapter 9A would have the effect of nullifying the attempt by any chapter 9 company to shed its status as an assessment company and emerge as a legal reserve company. He concluded that the amended articles of incorporation providing for the elimination of assessment features in existing and future policies were not inconsistent with section 10951.2, but that such elimination was in accord with the basic theory of chapter 9A.

As required by section 12923, *supra,* defendant thereupon issued his permit.

Plaintiff proceeded with the transformation. In accordance with section 10951.5, *supra,* it offered capital stock to the policyholders under the 30-day preferential right to buy. Some took advantage of this. Others did not. The unpurchased stock was sold to Pierce Brothers.

The next year plaintiff decided to increase its capital to $100,000 and filed its application for permit to issue securities. At that time the Insurance Department required that a person organizing a standard legal reserve insurance company under chapter 6 (which required a minimum capital of $200,000) should have in addition to the capital a surplus of $200,000 in order to secure a permit for the sale of the stock and the

consequent right to qualify the company to do business. However, the commissioner advised plaintiff at that time that a transformation from 9A status to the standard reserve plan would be approved on the basis of $100,000 surplus, because it was an organized and growing company.

Thereafter, plaintiff took the necessary steps to perfect its transformation from chapter 9A to a chapter 6 company. Such transformation, together with the sale of stock was completed on December 11, 1946.

In the meanwhile, defendant was conducting a periodic examination of the affairs of plaintiff. At the beginning of 1947, in a report of such examination, defendant raised the question as to whether chapter 9 policies were entitled to participate in the profits of the company. Plaintiff protested the report and demanded that the question be again submitted to the attorney general. His opinion of March 12, 1947 (9 Op.A.G. 226, 228) in accord with his two previous opinions held as follows:

"Consistency compels the conclusion that the transformation upon completion eliminates the rights of such policyholders to receive earnings attributable to such policies." In other words, the attorney general therein adhered to his view that the transformation destroyed all the equities of the mutual policyholders in the company, and that they had no rights except those actually set forth by the express terms of their contracts.

In the same year, i.e., 1947, the Legislature amended section 12923, *supra*, by deleting that part thereof which made opinions of the attorney general binding on the insurance commissioner.

Thereafter, in March of 1948, defendant ordered plaintiff to appear for a hearing at his office, pursuant to section 12924, Insurance Code. The hearing was held in April, 1948, and on March 31, 1949, defendant wrote plaintiff a letter in which his conclusions were stated as follows:

"1. That the company is governed by provisions of section 10951.2 of the Insurance Code . . ."

2. That the records of the company should be so kept as to make readily determinable the amount of profit earned on chapter 9 business.

3, 4 and 5. That the surplus existing on the date of the transformation of the company to chapter 9A, and any subsequent profits on the business then on its books, belong to

the policyholders and subject to distribution to them, and may not be distributed as dividends to the stockholders of the Pierce Insurance Company.

"6. In view of the fact that the Chapter 9 policyholders constitute a closed group which will eventually diminish to extinguishment, the amounts to which they are entitled should be distributed to the Chapter 9 policyholders from time to time in such amounts that the balance thereof retained by the company shall at no time bear an unreasonable relationship to the amount of Chapter 9 business remaining in force."

In order to settle the controversy, plaintiff brought the instant action on May 25, 1949, for declaratory relief and for an injunction restraining defendant from further interference in its business.

From findings of fact made by the trial court, it concluded, among other things:

"III. That the Chapter 9A law is valid and legal and plaintiff's transformation from Chapter 9 to Chapter 9A, which . . . included the elimination of the assessment feature from Chapter 9 policies, was valid and legal.

"IV. In connection with plaintiff's transformation from Chapter 9 to Chapter 9A, such Chapter 9A laws were complied with by plaintiff; that they are valid, fair and practicable; that their purpose and intent have been complied with; that the transformation to Chapter 9A completely complied with such law and the purpose and intent thereof; that the transformation was a complete transformation of the company and not an organization of a new Stock Company with an appendix attached to it of the walled-off, separate group of Chapter 9 policyholders; that the policyholders made their election to transform to a Stock Company; that some of the policyholders elected to buy their allocated stock and to take a chance on future profits or losses and some elected not to buy their stock and thereby to take no chance on future profits or losses but to continue as insureds without being subjected to the possibility of assessments or payment of losses; that if any profits are derived since such transformation or in the future from the Chapter 9 policies, such would go into the surplus of the company, and if the Board of Directors would declare a dividend therefrom, such dividend would be payable to the then stockholders whoever they might then be; that the Chapter 9 policyholders who did not elect to buy such stock would not be entitled to any such profits or dividends therefrom unless they should then be

stockholders; to wall off and separate the Chapter 9 business . . . would not be in keeping with the purpose and intent of the Chapter 9A laws and would do violence to the policy contracts of such Chapter 9 policyholders and section 10951.2 of the Insurance Code. . . .

"VI. That upon and after the transformation of plaintiff from Chapter 9 to Chapter 9A plaintiff company continued to assume and be liable for the contractual obligations set forth in the Chapter 9 policies including the obligation of maintaining and increasing the legal reserves on said policies. . . . On and after such transformation the entire assets of plaintiff company, including all capital coming into plaintiff company, stand as security for said Chapter 9 policies and plaintiff's contractual obligations thereunder, without the right of plaintiff to thereafter levy or call for additional assessment against such Chapter 9 policyholders in addition to the stipulated premiums provided for in such Chapter 9 policies. That the relationship between plaintiff company and the Chapter 9 policyholders is that of debtor and creditor and plaintiff holds no funds or assets in trust for such policyholders."

Defendant appeals from the judgment which followed in favor of plaintiff and restraining and enjoining defendant from enforcing his orders contained in his letter of March 31, 1949, addressed to plaintiff.

Appellant urges that chapter 9A was never intended to authorize complete destruction without compensation of the equity of the mutual company policyholders.

Said chapter, the transformation statute, provides that "Any domestic insurer authorized to transact business under the provisions of Chapter 9 . . . may by vote of two-thirds of its policyholders accept the provisions of this chapter (9A) and amend its articles of incorporation and by-laws to conform to the same so as to cover and enjoy any and all of the provisions and privileges of this chapter. (§ 10951.)

"Such action shall be taken by resolution adopted by not less than a two-thirds vote of the policyholders present . . . at a meeting duly called for that purpose . . . (§ 10951.1.)

"Such corporation shall be a continuance of the original corporation by the same name or by any other name approved by the commissioner. Such transformation, however, shall in no way annul, modify or change any of the existing contracts and liabilities of such corporation, and any and all

such contracts and liabilities shall continue in force and effect the same as though such corporation had not transformed or qualified under this article, nor shall such transformation in any way prejudice, impede or impair any pending action or proceeding or any rights previously acquired. (§ 10951.2.)

"The capital stock issued at the time/ of transformation as herein provided, shall be first offered to each policyholder of the insurer in the ratio that the total number of shares authorized for such issue bears to the total number of policyholders at the date of transformation. Any such stock not subscribed by any policyholder within thirty days from date of offering may be sold to the public. Such stock shall be sold for cash and for at least 150 per cent of par value." (§ 10951.5.)

It is plain from the foregoing that the obligations of the company before its transformation, as set forth in its policies, continue intact.

"The interest of policyholders in a mutual company are twofold, since they are both insurer and insured; in respect to the former they are entitled to share in the losses and profits of the business on the basis of a partnership, except so far as the charter or policy contract provides otherwise. In such dual capacity, their rights are fixed partly by the policy contract, partly by the by-laws of the company, and partly by the relevant statutes" (Vol. 18, Appleman Insurance Law and Practice, p. 97, § 10046.)

An examination of the policy issued by the original company discloses that the insurer agreed to pay its face upon contingencies mentioned: for instance, death, if the policy was then in full force and effect. As a condition to its remaining in force, the policy required the policyholder to pay the stipulated premiums and in addition any assessment levied by the company to balance receipts with necessary expenditures. There is no provision in the policy giving the policyholder any right to share in the assets: reserves, profits or surplus. Neither is there any provision requiring the company to make assessments against its policyholders. It follows, that assets of the type just mentioned were then necessarily owned by the company as an entity, before its transformation.

"On conversion of a mutual company into a stock company, the assets of the old company are transferred to the new company by operation of law, and the members of the

old company have priority in subscribing to the new company's stock." (44 C.J.S. 651, § 106.)

And in 18 Appleman Insurance Law and Practice at page 96, section 10045 (note 10), it is said: Where the law "permits mutual fire insurance companies to be converted into stock corporations with the consent of the superintendent of insurance, and on a three-fourths vote of the president and directors, and provides that on the performance of prescribed conditions precedent to the change the superintendent shall certify to that effect and that the corporation is 'reorganized' as an insurance stock corporation, whereupon the law applicable to such corporations shall become applicable to it, *Held*, that the statute by implication transfers the assets of the old company to the new. *Grobe* v. *Erie County Mut. Ins. Co.*, 1898, 53 N.Y.S. 628, 24 Misc. 462, affirmed 57 N.Y.S. 290, 39 App.Div. 183, and 62 N.E. 1096, 169 N.Y. 613."

Plaintiff, when operating under chapter 9, had no capital, and the assessment features of the policies were substituted for capital found in a capital stock company, i.e., if funds were needed, the policyholders could be made to pay assessments in addition to premiums. Chapter 9A prescribes that capital must be set up and increased as volume of business increases, together with prescribed reserves. These items of capital and reserve after transformation guarantee chapter 9 policies as well as chapter 9A policies. The policyholders are no longer subject to assessment, and liability thereupon falls on the stockholders.

In the instant case, the policyholders have exercised their choice. Those who elected not to purchase shares of capital stock are no longer subject to assessment on account of ownership of their policies. But by reason of total transformation, they are not entitled to share in the profits of the company. This right is reserved to the stockholders, who have now assumed the burdens. In other words, upon completion of the transformation, former chapter 9 policyholders are not entitled to preferential or separate treatment.

It is next argued by appellant that "the pleadings and evidence in the cause show that every finding upon which the judgment might otherwise be supported is vitiated by refusal of the court to admit relevant evidence of a non-cumulative nature."

During the course of the trial it was agreed that the primary issue was a question of law. This was stated by the trial court in his memorandum ruling as follows:

510

"The question for decision is whether a so-called 'legal reserve' (capital stock) insurance corporation created by amendments to the charter of a 'level premium' (Mutual non-stock) insurance corporation is under an obligation to segregate and hold in trust the net surplus or excess earnings, accrued and accruing, from the premiums paid in by those who became and are still policyholders of the original corporation."

This question was decided against the contentions of appellant and in favor of respondent.

Thereafter, at the request of the then attorney general representing the insurance commissioner, the case was reopened for the purpose of allowing him to make an offer of proof. The proffered evidence had to do with questions of figures, accounting and methods of accounting, which the court refused on the ground that it was incompetent, irrelevant and immaterial.

Obviously this ruling was proper inasmuch as the court had decided the primary issue against the contentions of appellant.

The findings of fact and the judgment have as their basis the respondent's theory of the case, to wit: that a complete transformation from chapter 9 to chapter 9A was consummated, pursuant to statute. And, as a result, the policyholders of the old company are not now entitled to preferential treatment by the new company.

It is further urged that the "injunction was unnecessary, and is not justified by any evidence of the Commissioner's acts set forth in the cause."

By the judgment, appellant "is restrained and enjoined from further making, or enforcing, or attempting to make or enforce, or compelling, or attempting to compel plaintiff to comply with the orders contained in the Insurance Commissioner's letter to plaintiff dated March 31, 1949 . . ."

The effect of this is to annul what the trial court believed to be improper orders, and should not be deemed a reflection upon appellant in the performance of his official duties, as he now claims.

The parties hereto have filed supplemental briefs on the question whether the transformation here might be a violation of section 1101 of the Insurance Code, which provides:

"An admitted insurer's officers, directors, trustees and

any persons who have authority in the management of the insurer's funds, shall not, unless otherwise provided in this code:

"(a) Receive any money or valuable thing for negotiating, procuring, recommending or aiding in, any purchase by or sale to such insurer of any property, or any loan from such insurer.

"(b) Be pecuniarily interested as principal, coprincipal, agent, attorney or beneficiary, in any such purchase, sale or loan.

"(c) Directly or indirectly purchase, or be interested in the purchase of, any of the assets of the insurer."

It appears that Mark Pierce, vice-president of respondent, was also an officer of Pierce Brothers, the company which bought all of the stock not sold to policyholders upon transformation of respondent from chapter 9 to chapter 9A.

In his closing brief, appellant cited the case of *Industrial Indem. Co.* v. *Golden State Co.,* 117 Cal.App.2d 519 [256 P.2d 677], which holds that a purchase of a mutual insurance company by a stock company having common officials was void under said section 1101, *supra.*

Appellant in his supplemental brief urges that "the sale of stock to finance the transformation to a stock company, which sale would obviously give control of respondent to the purchaser while the vice-president of respondent was an official of the purchaser, certainly indicates the application of section 1101 to the transaction. That is not here important in the sense that appellant is not seeking to void the sale, but simply to see that the sale is not used by respondent as a means of depriving the policyholders of their equity in the company without compensation."

The cited case, i.e., *Industrial Indem. Co.* v. *Golden State Co., supra,* involved the sale and transfer of all the property, business and assets of the reciprocal insurance company to, and a purchase of them by the stock company for a certain price. It involved the transfer of title from a seller to a purchaser, from one entity to another, the purchase price being paid by the latter to the former.

In the instant case, there was no such sale. At the time and after the transformation, respondent owned its assets and continued to do so. It was a continuation of the same corporation by the process of compliance with chapter 9A and the amendment of its articles of incorporation. This court is

of the opinion that section 1101, *supra,* has no application to the facts presented in the case before it.

For the reasons stated, the judgment is affirmed.

White, P. J., and Doran, J., concurred.

A petition for a rehearing was denied May 3, 1954, and appellant's petition for a hearing by the Supreme Court was denied June 9, 1954. Carter, J., was of the opinion that the petition should be granted.